# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**CRG NETWORK,**

         Plaintiff,

      **-vs-**　　　　　　　　　　　**Case No. 14-C-719**

**THOMAS BARLAND, HAROLD FROELICH,
MICHAEL BRENNAN, ELSA LAMELAS,
GERALD C. NICHOL, and TIMOTHY VOCKE,**

         Defendants.

---

## DECISION AND ORDER

---

The plaintiff, CRG Network, is an organization whose mission is to help citizens elect fiscally conservative candidates, assert property rights, and remove corrupt and/or fiscally irresponsible politicians from office. CRG is a "committee" as that term is defined in Wisconsin's campaign finance law. Wis. Stat. § 11.01(4).

In the upcoming general election, CRG believes that Dan Knodl, Robyn Vos, John Nygren and Dale Kooyenga are excellent candidates for the Wisconsin Assembly because they share the same fundamental beliefs as CRG with respect to fiscal conservatism, limited government, property rights, individual liberty, and clean and ethical government. As such, CRG sent $250 campaign donations to each of these individuals. Mr. Knodl

accepted his donation, but the other candidates returned their respective donations, either in whole or in part, because they had reached the $7,763 limit on donations from committees like CRG. S*ee* Wis. Stat. § 11.26(9)(b), discussed more fully below.

In this action, CRG argues that the contribution limits in § 11.26(9) violate its First Amendment right to participate in the upcoming election. CRG moves for a preliminary injunction, arguing that recent Supreme Court case law, especially *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), demonstrates that it is likely to succeed on the merits of its claim.

The Court agrees. The defendants, various members of the Wisconsin Government Accountability Board, will be enjoined from enforcing § 11.26(9).

***

To obtain a preliminary injunction, the moving party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits. *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014). If this showing is made, the Court "weighs the competing harms to the parties if an injunction is granted or denied and also considers the public interest." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). In the

- 2 -

First Amendment context, however, likelihood of success is "usually the decisive factor." *Barland* at 830. This is because the loss of First Amendment freedoms "unquestionably constitutes irreparable injury," and "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU v. Alvarez*, 679 F.3d 583, 589, 590 (7th Cir. 2012).

CRG, as noted, meets the statutory definition of a "committee," which is "any person other than an individual and any combination of 2 or more persons, permanent or temporary, which makes or accepts contributions or makes disbursements, whether or not engaged in activities which are exclusively political, except that a 'committee' does not include a political 'group' under this chapter." § 11.01(4). Committees must comply with extensive regulations, including registering with the GAB, § 11.05(1), having an official treasurer and separate campaign depository account, § 11.05(3), paying an annual filing fee of $100, § 11.055, and filing extensive disclosure reports twice per year, § 11.06. A committee is prohibited from donating more than $500 to any one candidate for the State Assembly, § 11.26(2)(c), as is an individual, § 11.26(1)(c).

Subsection 11.26(9) imposes additional limits on donations. As relevant here, no individual who is a candidate for state or local office may receive "more than 45 percent of the value of the total disbursement level

- 3 -

determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees other than political party and legislative campaign committees subject to a filing requirement, not including any transfer from any personal campaign committee to another personal campaign committee." § 11.26(9)(b).[1] Contributions received in excess of those limits must be returned to the donor. § 11.26(11). The "total disbursement level" for State Assembly Candidates is $17,250, § 11.31(1)(f); forty-five percent of that amount is $7,763. Therefore, once a candidate for State Assembly receives $7,763 in donations from committees, the candidate must return any further donations to the donor. Accordingly, Messrs. Vos and Nygren returned CRG's entire donation because they had already accepted $7,763 in committee donations; Mr. Kooyenga returned $86, presumably because he had already received $7,599 prior to receiving CRG's donation.

In *McCutcheon*, the Supreme Court addressed the aggregate contribution limits in the Federal Election Campaign Act of 1971 (FECA),

---

[1] § 11.26(9)(a) is identical in all material respects, with the differences emphasized as follows: "No individual who is a candidate for state or local office may receive and accept more than *65* percent of the value of the total disbursement level determined under s. 11.31 for the office for which he or she is a candidate during any primary and election campaign combined from all committees *subject to a filing requirement, including political party and legislative campaign committees, including any transfer from any personal campaign committee to another personal campaign committee.*"

- 4 -

as amended by the Bipartisan Campaign Reform Act of 2002 (BCRA). The Court began its analysis, of course, with *Buckley v. Valeo*, 424 U.S. 1 (1976), and the fundamental distinction in campaign finance law between expenditures and contributions. Expenditure limits "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." 134 S. Ct. at 1444 (quoting *Buckley* at 19). Thus, expenditure limits are subject to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* (quoting *Buckley* at 44-45). Under exacting scrutiny, the government may regulate protected speech only if the regulation promotes a compelling interest and is the least restrictive means to further the articulated interest. *Id.*

Contribution limits, as explained in *Buckley*, "impose a lesser restraint on political speech because they 'permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* (quoting *Buckley* at 21). The Court applied a lesser but "still rigorous standard of review" with respect to contributions, under which even a "significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs

- 5 -

means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.* The government's interest in preventing *quid pro quo* corruption or its appearance is a "sufficiently important" government interest for purposes of this lesser standard of review. *Id.* at 1445. Even so, the Court in *McCutcheon* found a "substantial mismatch" between this objective and the "means selected to achieve it," *i.e.*, the aggregate limit on total individual contributions. *Id.* at 1446. Thus, the Court declared the aggregate limits unconstitutional because they "do little, if anything, to [combat corruption], while seriously restricting participation in the democratic process." *Id.* at 1442.

To illustrate, the base limit at issue in *McCutcheon* was $2,600 per election to a federal candidate ($5,200 total for the primary and general elections); the aggregate limit was $48,600. As the Chief Justice wrote:

> The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount. But Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption. If there is no corruption concern in giving nine candidates $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime. And if there is no risk that additional candidates will be corrupted by donations of up to $5,200, then the Government must defend the aggregate limits by demonstrating that they prevent circumvention of the base limits.

- 6 -

*Id.* at 1452 (emphasis in original). Similarly here, if another committee's single donation of up to $500 to a particular candidate carries no risk of *quid pro quo* corruption, how can CRG's $250 donation to the same candidate be deemed corrupting? Moreover, how could the same $250 donation be non-corrupting when given before the aggregate limit is reached, but carry the potential for corruption if given thereafter? It cannot. CRG cannot be prevented from making a donation up to the base statutory limit simply because of the aggregation of previous donations. *See, e.g., Seaton v. Wiener*, --- F. Supp. 2d ----, Civil No. 14-1016 (DWF/JSM), 2014 WL 2081898, at *5 (D. Minn. May 19, 2014), which granted a preliminary injunction against Minnesota's "special sources" limit, following *McCutcheon*: "One would assume that the thirteenth contribution to a legislative candidate in the amount of $1,000 causes no more concern of corruption than the first twelve $1,000 donations."

Accordingly, the government must "defend the aggregate limits by demonstrating that they prevent circumvention of the base limits." *McCutcheon* at 1452. In this respect, the defendants cling to the anti-circumvention rationale expressed by the Wisconsin Supreme Court in *Gard v. Wis. State Elections Bd.*, 456 N.W. 2d 809, 823 (Wis. 1990) (noting that "no provisions prevent narrow issue PACs from proliferating into

- 7 -

several other committees. Therefore, there is potential for these narrow issue PACs with large aggregations of wealth to circumvent the PAC-candidate contribution limits if it were not for sec. 11.26(9)(a) and (b)"). Moreover, the defendants insist that *McCutcheon* is distinguishable because federal campaign finance law, unlike Wisconsin law, includes statutes and rules that discourage or prevent individuals from creating multiple political committees to circumvent individual contribution limitations. This is a twisted view of *McCutcheon* and the current state of campaign finance law. In essence, the defendants seek to justify the violation of fundamental First Amendment rights because there aren't enough laws or rules in place to accomplish their goals.

To begin with, there *are* laws in place to prevent circumvention of the base contribution limits. *See* § 11.24(1) ("No person may, directly or indirectly, furnish funds or property to another person for the purpose of making a contribution in other than the person's own name"); *Gard* at 823 ("Both 'earmarking' contributions to a party for a specific candidate and 'laundering' contributions for a candidate through a party are prohibited by secs. 11.16(4) and 11.30(1), Stats., respectively"). Committees are also subject to disclosure requirements that expose exactly where contributions directly to candidates come from, regardless of how many hands they pass

- 8 -

through. § 11.06(1).

The defendants argue that the existence of an anti-proliferation rule under federal law, absent under Wisconsin law, distinguishes this case from *McCutcheon*. 134 S. Ct. at 1447 (2 U.S.C. § 441a(1)(5) "eliminates a donor's ability to create and use his own political committees to direct funds in excess of the individual base limits. It thus blocks a straightforward method of achieving . . . circumvention . . ."). Again, this is a fundamental misreading of *McCutcheon*. There are provisions in place under Wisconsin law to prevent circumvention of the base contributions, and if those are deemed insufficient, there are many other methods, including an anti-proliferation rule, that may be enacted. The existence of such alternatives, enacted or not, demonstrates that the aggregate limit in § 11.26(9) is not "closely drawn" to prevent base limit circumvention. *McCutcheon* at 1458 ("Importantly, there are multiple alternatives available to Congress that would serve the Government's anticircumvention interest, while avoiding 'unnecessary abridgement' of First Amendment rights").

Moreover, the defendants' imagined scenario, in which individuals create numerous political committees, donate money to each of them and then have those committees in turn contribute the money to the

- 9 -

individual's preferred candidate, is unlikely and impractical. It is impractical because of the administrative burdens associated therewith. §§ 11.05(1), 11.05(3), 11.055, 11.06, Wis. Stats. It is unlikely because a wealthy and motivated donor could simply spend unlimited funds for independent expenditures on behalf of his chosen candidate, as opposed to funneling contributions through multiple committees. *McCutcheon* at 1454 ("On a more basic level, it is hard to believe that a rational actor would engage in such machinations. In the example described, a dedicated donor spent $500,000 – donating the full $5,000 to 100 different PACs – to add just $26,000 to Smith's campaign coffers. That same donor, meanwhile, could have spent unlimited funds on independent expenditures on behalf of Smith").

Therefore, and in light of the Supreme Court's increasing impatience with this type of "prophylaxis-upon-prophylaxis" approach, CRG is likely to succeed on the merits of its claim that § 11.26(9) violates the First Amendment. *McCutcheon* at 1458 ("It is worth keeping in mind that the *base limits* themselves are a prophylactic measure. As we have explained, 'restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements'") (quoting *Citizens United v. FEC*, 558 U.S. 310, 357 (2010)) (emphasis in

original). The harm caused by this violation is irreparable, for which there is no adequate remedy at law. *Alvarez*, 679 F.3d at 589. Indeed, the clock is ticking towards election day, making preliminary injunctive relief all the more appropriate. The Court's injunction will also serve the public interest by vindicating First Amendment freedoms. *Id.* at 590 ("the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional").

With regard to the scope of the injunction, the defendants argue that CRG lacks standing to challenge § 11.26(9) insofar as it applies to contributions to candidates other than those for State Assembly (*i.e.*, for State Senate, Governor, or other state offices). This is incorrect. CRG has standing to pursue, as it has, a facial challenge to the statute. *4805 Convoy, Inc. v. City of San Diego*, 183 F.3d 1108, 1112 n.4 (9th Cir. 1999) ("a plaintiff whose conduct *is* protected may also bring a facial challenge to a statute that he contends is unconstitutional, without having to employ the overbreadth doctrine, by arguing that the statute could never be applied in a valid manner and would chill the speech of others"). Section 11.26(9) will be enjoined in its entirety.

\*\*\*

- 11 -

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** CRG's motion for a preliminary injunction [ECF No. 7] is **GRANTED**. The defendants are enjoined from implementing or enforcing Wis. Stat. § 11.26(9).

Dated at Milwaukee, Wisconsin, this 5th day of September, 2014.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

- 12 -