# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**CRG NETWORK,**

               Plaintiff,

       -vs-                             **Case No. 14-C-719**

**THOMAS BARLAND, HAROLD FROELICH,
MICHAEL BRENNAN, ELSA LAMELAS,
GERALD C. NICHOL, and TIMOTHY VOCKE,
each in their official capacity as Board Members
of the WISCONSIN GOVERNMENT ACCOUNTABILITY
BOARD,**

               Defendants.

---

## DECISION AND ORDER

---

On September 5, 2014, the Court issued an order that preliminarily enjoined the defendants, various members of the Wisconsin Government Accountability Board (the "GAB"), from implementing or enforcing the aggregate contribution limits in Wisconsin's campaign finance law. *CRG Network v. Barland*, 48 F. Supp. 3d 1191 (E.D. Wis. 2014). The plaintiff, CRG Network, now moves for summary judgment on its claims for declaratory and permanent injunctive relief. For the reasons previously stated and for the reasons that follow, CRG's motion is granted.

\*\*\*

CRG Network is an organization whose mission is to help citizens

elect fiscally conservative candidates, assert property rights, and remove corrupt and/or fiscally irresponsible politicians from office. CRG is a "committee" as that term is defined in Wis. Stat. § 11.01(4), subject to the filing requirements set forth in § 11.05. Historically, CRG Network has made donations to candidates for state office in Wisconsin.

In 2014, CRG Network believed that Dan Knodl, Robyn Vos, John Nygren, and Dale Kooyenga were excellent candidates for the Wisconsin Assembly because they share the same fundamental beliefs as CRG with respect to fiscal conservatism, limited government, property rights, individual liberty, and clean and ethical government. Thus, CRG sent $250 campaign donations to each of these candidates in early June, 2014, well in advance of the November 4, 2014 general election. Each candidate returned the donation, in whole or in part, because each had reached the aggregate limit on donations set forth in § 11.26(9), Wis. Stats. CRG filed suit, and the Court issued the aforementioned preliminary injunction, allowing CRG to make their desired donations. The GAB did not appeal the Court's injunction, which remains in place.

On December 16, 2014, the Court granted the parties' request that summary judgment briefing be delayed until after the upcoming legislative session. In that session, the Wisconsin Legislature took no action in

relation to Wisconsin's campaign finance law. Accordingly, CRG moved for summary judgment, and the matter is now fully briefed. This case is particularly appropriate for summary disposition since all material facts are undisputed. Fed. R. Civ. P. 56(a) (summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

**\*\*\*\***

Wisconsin's campaign finance law prohibits individuals and committees, such as CRG, from donating more than $500 to any one candidate for the State Assembly. Wis. Stat. §§ 11.26(2)(c), (1)(c). The law also imposes aggregate limits on contributions. Candidates can receive only 65% of the statutorily-defined total disbursement level from "all committees subject to a filing requirement, including political party and legislative campaign committees," § 11.26(9)(a), and only 45% of the total disbursement level from "all committees other than political party and legislative campaign committees subject to a filing requirement." § 11.26(9)(b). The total disbursement level for State Assembly candidates is $17,250, § 11.31(1)(f), 45% of which is $7,763.[1] Thus, once a State Assembly

---

[1] The amounts increase for other state offices. *See, e.g.,* § 11.31(1)(e) (total disbursement level for state senator is $34,500, 45% of which is $15,525); § 11.31(1)(c) (total disbursement level for attorney general is $539,000, 45% of which is $242,550).

- 3 -

candidate receives $7,763 in contributions from CRG-like committees (i.e., committees other than political party and legislative campaign committees), the candidate must return all subsequent contributions to the donor, which is exactly what happened in the instant case. § 11.26(11). Put another way, CRG could not donate to the candidates it wanted to support because other committees previously made donations to the same candidates.

Accordingly, this case involves a challenge to the amount of money that may be contributed to candidates for political office in Wisconsin. Contribution limits "impose a lesser restraint on political speech" than expenditure limits because they "'permit[] the symbolic expression of support evidenced by a contribution but do[] not in any way infringe the contributor's freedom to discuss candidates and issues.'" *McCutcheon v. Fed. Election Comm'n*, --- U.S. ----, 134 S. Ct. 1434, 1444 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 21 (1976)). Thus, while expenditure limits are subject to "exacting scrutiny," contribution limits are subject to a lesser but "still rigorous" standard of review. *McCutcheon*, 134 S. Ct. at 1444. Under this standard, even a "significant interference with protected rights of political association may be sustained if the State demonstrates a

---

The base contribution levels are also higher for such positions. *See* §§ 11.26(1), (2).

sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.*

Preventing *quid pro quo* corruption, or the appearance thereof, is a "compelling" or "sufficiently important interest" for either level of scrutiny; in fact, it is the "*only* public interest strong enough to justify restricting election-related speech …" *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 823 (7th Cir. 2014) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010)) (emphasis added). In a "series of cases over the past 40 years," the Supreme Court has

> spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech. We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. 'Ingratiation and access … are not corruption.' They embody a central feature of democracy – that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.
>
> Any regulation must instead target what we have called "*quid pro quo*" corruption or its appearance. That Latin phrase captures the notion of a direct exchange or an official act for money. 'The hallmark of corruption is the financial *quid pro quo*: dollars for political favors.' Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government 'into the debate over who should govern.' And those who govern should be the *last* people to help decide who *should* govern.

- 5 -

*McCutcheon*, 134 S. Ct. at 1441-42 (emphasis in original) (internal citations omitted). In other words, spending "large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid quo pro* corruption. Nor does the possibility that an individual who spends large sums may garner 'influence over or access to' elected officials or political parties." *Id.* at 1450-51. And "because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access." *Id.* at 1451 (citing *Citizens United*, 558 U.S., at 360).

This Court's grant of preliminary injunctive relief was based on *McCutcheon*, wherein the Supreme Court considered the aggregate contribution limits in the Federal Election Campaign Act of 1971 (FECA), as amended by the Bipartisan Campaign Reform Act of 2002 (BCRA). Under that regime, the base limit for individual contributions was $2,600 per election per candidate ($5,200 total for the primary and general elections), and the aggregate limit (for the election cycle at issue) was

- 6 -

$48,600 to federal candidates.[2] The Court explained:

> To put it in the simplest terms, the aggregate limits prohibit an individual from fully contributing to the primary and general election campaigns of ten or more candidates, even if all contributions fall within the base limits Congress views as adequate to protect against corruption. The individual may give up to $5,200 each to nine candidates, but the aggregate limits constitute an outright ban on further contributions to any other candidate (beyond the additional $1,800 that may be spent before reaching the $48,600 aggregate limit). At that point, the limits deny the individual all ability to exercise his expressive and associational rights by contributing to someone who will advocate for his policy preferences. A donor must limit the number of candidates he supports, and may have to choose which of several policy concerns he will advance – clear First Amendment harms the dissent never acknowledges.

*McCutcheon*, 134 S. Ct. at 1448-49. The Court rejected the government's argument that the aggregate limits furthered the permissible objective of preventing *quid pro quo* corruption:

> The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount. But Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption. If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others corruptible if given a dime.

*Id.* at 1452 (emphasis in original). "Similarly here," as the Court already explained, "if another committee's single donation of up to $500 to a

---

[2] This mechanics of this regime are slightly different than the one at issue here because it places an aggregate limit on individual contributions, not candidate receipts. This distinction is constitutionally irrelevant.

- 7 -

particular candidate carries no risk of *quid pro quo* corruption, how can CRG's $250 donation to the same candidate be deemed corrupting? Moreover, how could the same $250 donation be non-corrupting when given before the aggregate limit is reached, but carry the potential for corruption if given thereafter?" *CRG Network*, 48 F. Supp. 3d at 1194-95; *see also Catholic Leadership Coalition of Texas v. Reisman*, 764 F.3d 409, 432 (5th Cir. 2014) (striking down a Texas statute that placed an aggregate limit of $500 on the amount of contributions that a political action committee could make within its first 60 days, post-*McCutcheon*: "if a single $500 contribution does not risk corruption, it is hard to see how three $167 contributions hold out such a significant risk of corruption that the former is permitted and the latter is not"); *Seaton v. Weiner*, 22 F. Supp. 3d 945, 950 (D. Minn. 2014) (post-*McCutcheon* decision granting preliminary injunction against Minnesota's "special sources" limit: "One would assume that the thirteenth contribution to a legislative candidate in the amount of $1,000 causes no more concern of corruption than the first twelve $1,000 donations").[3]

Because there is "no risk" that candidates will be corrupted by

---

[3] Unlike Wisconsin, Minnesota subsequently repealed this provision. 2015 Minn. Laws Chapter 3, Section 15. Massachusetts and Maryland stopped enforcing aggregate limits in light of *McCutcheon*. Marc E. Elias, Jonathan S. Berkon, *After McCutcheon*, 127 Harv. L. Rev. F. 373, 379 (June 20, 2014).

- 8 -

donations of up to $500 after the aggregate limit has been reached, the GAB must "defend the aggregate limits by demonstrating that they prevent circumvention of the base limits." *McCutcheon* at 1452. *McCutcheon* engaged in a lengthy discussion regarding "various statutes and regulations currently in effect" at the federal level to demonstrate that the danger of circumvention – i.e., the possibility that an individual might contribute "massive amounts of money to a particular candidate through the use of unearmarked contributions" to entities likely to support the candidate – is "far too speculative." *Id.* Instead of preventing corruption or its appearance, the "improbability of circumvention indicates that the aggregate limits … further the impermissible objective of simply limiting the amount of money in political campaigns." *Id.* at 1456.

Accordingly, the GAB argues that *McCutcheon* is distinguishable because certain laws exist at the federal level to prevent circumvention that have not been enacted in Wisconsin. *See id.* at 1446-47 (citing 2 U.S.C. § 441a(a)(5),[4] an anti-proliferation rule that "eliminates a donor's ability to create and use his own political committees to direct funds in excess of the individual base limits"). Again, this argument represents a "fundamental misreading" of *McCutcheon*. 48 F. Supp. 3d at 1195. *McCutcheon*'s

---

[4] This provision is now located at 52 U.S.C. § 30116(a)(5).

Case 2:14-cv-00719-RTR   Filed 10/14/15   Page 9 of 13   Document 28

extended discussion of the federal regulatory scheme was meant only to demonstrate that the government's concerns about circumvention were overwrought, not that the aggregate limits would be upheld if those regulations were absent. "*Quite apart from the foregoing*, the aggregate limits violate the First Amendment because they are not 'closely drawn to avoid unnecessary abridgement of associational freedoms.'" *McCutcheon* at 1456 (quoting *Buckley*, 424 U.S. at 25) (emphasis added).

Indeed by making this argument, the GAB implicitly gives up the game by conceding that there are narrower, more closely-drawn measures to achieve their anti-corruptive purposes. The GAB complains that such measures would be difficult to pass. This is no excuse for continued infringement of fundamental First Amendment constitutional rights.

This attitude reflects a GAB mindset of treating circumvention as an end in itself, divorced from its justification as a preventative of *quid pro quo* corruption. However, circumvention is not an end in itself but is only relevant in relation to the corrupting influence of donations that exceed base contribution limits. *See Fed. Election Comm'n v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("all members of the Court agree that circumvention is a valid theory of *corruption*") (emphasis added). The government can target evasive attempts to exceed base

- 10 -

contribution limits, but only because excess contributions raise the specter of *quid pro quo* corruption – at least presumably. "It is worth keeping in mind that the *base limits* themselves are a prophylactic measure. As we have explained, 'restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements.'" *McCutcheon* at 1458 (quoting *Citizens United*, 558 U.S. at 357) (emphasis in original).

In *McCutcheon*, as here, the "indiscriminate ban on all contributions above the aggregate limits is disproportionate to the Government's interest in preventing corruption." 134 S. Ct. at 1458. This is so because § 11.26(9) is over-inclusive *and* under-inclusive. It is over-inclusive because the aggregate limit prevents all contributions once a candidate's receipts meet a certain threshold. It is under-inclusive because § 11.26(9) does not prevent an individual from setting up multiple committees, giving $500 to each committee, and then directing each committee to give $500 to a specific candidate, so long as the candidate has yet to reach the aggregate contribution limit. *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) ("The notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles") (emphasis in original). Thus, the aggregate limit does not even prevent the type of

- 11 -

circumvention that the GAB is crying foul about.

Finally, the Court finds it telling that the GAB persists in relying upon *Gard v. Wis. State Elections Bd.*, 456 N.W.2d 809 (Wis. 1990), an outdated case that upheld § 11.26(9) against a previous constitutional challenge. In *Gard*, the Wisconsin Supreme Court reasoned that the purpose of § 11.26(9) is to "*limit the impact of huge special interest contributions on a candidate and to encourage a broad and diverse base of support* in order to prevent either actual corruption or the appearance of corruption." 456 N.W.2d at 823 (emphasis added). These justifications are no longer valid in light of *McCutcheon*, *Citizens United*, and other cases handed down by the United States Supreme Court. "Our cases have held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption. At the same time, *we have made clear that Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others*." *McCutcheon* at 1441 (emphasis added). The GAB's viewpoint on this issue seems to be that to prevent corruption in politics it must use the electoral process to keep money out of politics. That view is obsolete. The greatest guarantee against corruption in politics is an enlightened, educated, and engaged electorate,

- 12 -

which is achieved by preserving and protecting that electorate's First Amendment political speech freedoms.

*****

CRG Network's motion for summary judgment [ECF No. 19] is **GRANTED**. The contribution limits in Section 11.26(9), Wis. Stats., are unconstitutional on their face, and the defendants are permanently enjoined from enforcing them.

Dated at Milwaukee, Wisconsin, this 14th day of October, 2015.

SO ORDERED:

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**